

# THE ATTORNEY GENERAL

## OF TEXAS

GERALD C. MANN

XXXXXXXXXXXXXXX
~~WILL WILSON~~
ATTORNEY GENERAL

AUSTIN 11, TEXAS

Hon. Walter C. Woodward, Chairman
Board of Insurance Commissioners
Austin, Texas

Dear Sir:

Opinion No. O-1937
Re: Does a statewide mutual com-
pany operating in Texas as
such and being licensed to
issue policies on the assess-
ment or natural premium plan
have the right under its
charter to issue other forms
of policies, and especially
legal reserve policies, and
to charge legal reserve pre-
miums?
(2) Would such action constitute
a violation of its charter
powers?

Your request for an opinion of this department on
the above stated questions has been received.

Your letter reads as follows:

"The National Aid Life Insurance Company of
Oklahoma City is now operating in Texas as a
statewide mutual assessment company, operating in
accordance with the provisions of Chapter 5 of
Title 78, Revised Civil Statutes of 1925. The
law under which this company now operates has
been repealed but companies operating at the time
of the repeal of the statute are permitted to
continue operating as they were prior to the re-
peal, and for the purpose of this letter, we
treat the company as legally operating in Texas
as an assessment life insurance company issuing
policies on the assessment or natural premium
plan.

"This particular company is requesting a
certificate of authority to issue a so-called
legal reserve policy exactly like legal reserve

companies issue and which policy will provide for
loan features, surrender values and non-forfeiture
provisions, but of course does not provide for any
assessment of any kind or character.

"In connection with the foregoing, you are
informed that the State of Oklahoma, which is
the home state of the company, recently enacted
a statute whereby this particular company is
authorized to issue, not only its assessment or
natural premium plan policies, but to also issue
legal reserve policies. We would like to be ad-
vised whether the company would be permitted under
its present certificate of authority, or any re-
newal thereof, to issue in addition to the poli-
cies it may now issue, to-wit:  on the assessment
or natural premium plan, so called legal reserve
policies.

"It has occurred to us that a statewide mu-
tual company operating in Texas as such and
being licensed to issue policies on the assess-
ment or natural premium plan would not under its
charter also have the right to issue other forms
of policies and especially legal reserve policies
and to charge legal reserve premiums and that
such action would constitute a violation of its
charter powers. We, therefore, request your
opinion as here and above indicated."

The above mentioned company is now and has for
several years past operated in accordance with the provi-
sions of Chapter 5, Title 78, Revised Civil Statutes of
1925. Chapter 5, Title 78, Revised Civil Statutes of 1925,
was repealed by Acts of the 41st Legislature, 1st Called
Session, p.90, ch. 40, sec. 18. However, the repeal of
this chapter does not apply to or affect any company or
association doing business under the repealed law. In this
connection we refer to Article 4860a-18, which reads as
follows:

"Chapters 5,6,9,12,13,14 and 15 of Title
78 of the Revised Civil Statutes of 1925, and
all other laws or parts of laws in conflict
with the provisions of this Act (Arts. 4860a-1
to 4860a-19; P.C. Art. 1117a), are hereby re-
pealed; provided that such repeals and the
provisions of this Act shall not apply to or
affect any Company or Association of this State

now doing business under the laws repealed, and they shall continue to be governed by the regulatory provisions of such laws.  Any Company organized and transacting business under any of the laws repealed by this Act, or any general law of this State other than Article 8308 or any other article under Title 130, Revised Civil Statutes of Texas, 1925, may, however, by resolution of its Board of Directors, duly approved by the majority of the members, at a meeting specially called for that purpose, and duly certified to by the President and Secretary, and filed with the Board of Insurance Commissioners elect to adopt and become subject to the provisions of this Act, in lieu of any Act or Acts theretofore governing such Company or Association.

"Any Company or Association so electing and fully complying with this Act, may thereafter effect such kinds of Insurance as is authorized by this Act, and specified in its Article of Association then in force, or as then or thereafter amended, together with such additional kinds of insurance as are specified in such resolution and authorized by this Act."

Article 4781, Chapter 5, Title 78 (now repealed) read as follows:

"Companies or associations organized under the laws of any other State of the United States, carrying on the business of life or casualty insurance on the assessment or natural premium plan, having cash assets of a sum not less than one hundred thousand dollars, invested as required by the laws of this State regulating other insurance companies, shall be licensed by the Commissioner to do business in this State, and be subject only to the provisions of this chapter.  Such company or association shall first file with said Commissioner a certified copy of its charter, a written agreement appointing said Commissioner and his successor in office, to be its attorney, upon whom all lawful process in any action or proceeding against it may be served; a certificate under oath of its president and secretary that it is paying, and for the twelve months next preceding has paid, the maximum amount named in its policies or certi-

ficates in full; a statement under oath of its
president and secretary of its business for
the year ending on the thirty-first day of Dec-
ember preceding; a certified copy of its con-
stitution and by-laws, and a copy of its policy
and application; a certificate from the proper
authority in its home State that said company
or association is lawfully entitled to do busi-
ness therein, and has at least one hundred
thousand dollars surplus assets subject to its
indebtedness. The Commissioner shall issue a
license to any company or association complying
with the provisions of this chapter. Every
such company or association shall annually there-
after before such license is renewed, file with
said Commissioner on or before the first day
of March, a statement under oath of its presi-
dent and secretary, or like officers, of its
business for the year ending December 31 pre-
ceding."

The appellate court in the cases of National
Life Ass'n. v. Hagelstein, 156 S.W. 353; North American
Accident Insurance Company v. Hodge, 208 S.W. 700; Mer-
chants Life Insurance Company v. Lathrop, 210 S.W. 593;
Same v. Hanks, 210 S.W. 596; held that this Article
(Art. 4781) applies only to the proceedings required to
obtain a license to do business in Texas, and does not
prevent any regulation of such companies which would re-
sult from applying other regulatory statutory provisions
to them.

By the provisions of Article 4781, supra, com-
panies or associations organized under the laws of any
other state of the United States, carrying on the business
of life or casualty insurance on the assessment or natural
premium plan, having cash assets of a sum not less than
one hundred thousand dollars, invested as required by the
laws of this state regulating other insurance companies,
shall be licensed by the Board of Insurance Commissioners
to do business in this State. Under the provisions of
Article 4781, supra, the Board of Insurance Commissioners
is not authorized to license any company or association
organized under the laws of any other state of the United
States, carrying on the business of life or casualty insu-
rance on the assessment or natural premium plan.

We quote from Corpus Juris, Vol. 32, pages 990 and
991 as follows:

"If there are no special provisions as to
foreign companies, such a company must comply
with the general statutes of the State relating
to the insurance business, although foreign com-
panies may by way of comity, be allowed to trans-
act business in the State without complying with
the laws regulating the business of domestic com-
panies.  If there are specific provisions as to
foreign companies, such companies may do business
in the State only on compliance with such condi-
tions.  A foreign company is bound at its peril
to take notice of express provisions of law stating
the terms upon which it will be permitted to do
business in the state.  If the statute is complied
with, the company may do business in the State,
although its charter authorizes other business
than insurance. . ."

The case of State ex rel. National Life Association
of Hartford, Conn. v. Matthews, State Superintende of Insu-
rance, 49 NE 1034, among other things, holds in effect that
Sections 3587-3596, inclusive, Revised Statutes of the State
of Ohio, under which life insurance companies intending to
transact business on the mutual or stock plan are organized,
require such companies to have capital stock and stockholders,
and although, when thus organized, they have no authority to
transact business on the assessment plan, the want of such
authority is not a consequence of their having capital stock
and stockholders, nor of want of power in the legislature, to
confer it, but results solely from an omission of the legis-
lature to clothe them with such power.  Notwithstanding the
want of such authority in an Ohio corporation created under
those sections, yet, as the powers of a corporation depend on
its charter and the laws of the state where it is organized,
if the charter of an insurance company created in another
state, together with the assessment plan, it should be ad-
mitted, under section 3630e, to transact business on that
plan within this state, upon its complying with this sec-
tion in other respects, although it may have capital stock
and stockholders for whose benefit it was created.  However,
what constitutes the transaction within the meaning of that
term as used in said Section 3630e, should be determined by
the laws of this state, and according to those laws that
phrase should be held to contemplate a scheme of insurance
conducted for the sole benefit of the policyholders of a
concern, the principal source of revenue of which must arise
from post mortem assessments intended to liquidate specific
losses.  (Underscoring ours)

We quote from the above mentioned case as follows:

"However this may be, as long as the legislature retains this classification of life insurance companies for the purpose of granting to them permission to transact business in this state, the courts must regard it as substantial, and founded on some clearly understood and material features, wherein the two classes differ from each other. The retention of the classification would otherwise be unaccountable. This difference, we have shown, relates solely to the method in which a company exacts payment from a policyholder for the hazard it assumes by issuing a policy. The one class exacts premiums, or a fixed sum, payable periodically in advance, without reference to any specific loss; while the distinguishing feature of the other is an assessment of a sum, usually varying in amount according to the sum to be raised, to be ascertained and levied after the death of the insured. The reason, as we have seen, for this classification, and, for granting a license to a member of the 'assessment' class on more liberal terms than one belonging to the 'premium' class, is that the former class does not necessarily pay its losses from a fund already in existence, but may raise it by a post mortem assessment, while the latter class must resort to a fund already accumulated, and which, for the security of policyholders, should be safely invested. The scheme upon which the state exacts taxes from foreign insurance companies rests, also, to some extent, on this distinction."

The case of American Automobile Insurance Company v. Palmer, Insurance Commissioner, 140 NW 557, among other things, holds in effect that a foreign automobile insurance corporation authorized in the state of its creation to write liability insurance is not entitled to write such insurance in this state under the rule that the corporations of one state may exercise all of their powers in another state unless forbidden by the statutes, decisions, or policies of such state, since it is the policy of this state, as shown by its statutes, to separate the business of insurance on property from other lines of insurance.

We quote from the above mentioned case as follows:

"We may now consider the second question, i.e.: May the relator continue to issue so-called liability insurance as a matter of comity? The

position of counsel is stated by it as follows:
'There is an added reason peculiar to this rela-
tor which entitles relator to the relief prayed.
The order complained of, and here sought to be
set aside, is that we discontinue writing liability
insurance on automobiles.  It is undisputed that
by the laws of our domicile and by the express
terms of our charter in Missouri we are entitled
to write the form of policy we had been writing
which includes liability.  Under these circum-
stances, we are entitled to do the same in Michi-
gan.  The law is settled:  ''The corporations of
one state may exercise any or all of their powers
in another state unless the latter state by its
statutes, decisions or policies forbids'' (citing
many cases).  As one of the foregoing cases ex-
presses the rule:  ''Where there is no positive
prohibitive statute, the presumption under the
law of comity that prevails between the states of
the Union is that the state permits a corporation
organized in a sister state to do any act author-
ized by its charter or the law under which it is
enacted, except when it is manifest that such
act is obnoxious to the policy of the law in this
state.''  It becomes, therefore, necessary, in
demonstrating the applicability of the foregoing
proposition in the case at bar to ascertain if
there is any prohibitive statute or public policy
forbidding relator to write liability insurance.
The statutes relative to the admission of non-
resident insurance companies into Michigan are
confessedly loosely drawn, and not altogether
satisfactory.  An examination of all the sec-
tions in any way applying to the present situation
fails to disclose any express statute prohibiting
doing that which we ask.  On the other hand, the
general statute relative to the right of foreign
corporations to do business in this state in
express terms provides:  ''That no such foreign
corporation shall be permitted to transact busi-
ness in this State unless it be incorporated in
whole or in part for the purpose or object for
which a corporation may be formed under the laws
of Michigan, and then only for such purpose or
object.''  Public Acts 1907, No. 310.  By its
express terms, this act does not apply to insurance
companies.  It is manifest, therefore, that the
Legislature has expressly removed, so far at least,
that restriction from applying to insurance com-
panies.  In other words, instead of there being

legislative prohibition against our writing liability, such prohibition, in the light of the rule as announced, has been expressly removed from insurance companies.' The Attorney General does not concede that in its home state the relator is authorized to engage in the business of liability insurance, but contends that the policy of the State of Missouri is the same as the policy of this state, to segregate the different kinds of insurance, and to prohibit the transaction of more than one kind of insurance by the same company. It is not, however, necessary to pass upon that question.

"It is to be observed that in all the authorities upon this subject cited by counsel for relator it is made clear that, if the proposed act is obnoxious to the policy of the law of the state, the rule of comity will not prevail. We have quoted sufficiently from the briefs of counsel to indicate the questions involved. Without further citation of the authorities, we shall content ourselves with saying that we are in accord with the argument of the Attorney General, to the effect that it is the policy of the state to separate the business of insurance, and that, before we should hold this policy has been changed by the legislature, it should speak in less uncertain terms than it has done in the amendment of 1911. The case of American Telephone & Telegraph Co. v. Secretary of State, 159 Mich, 195, 123 N.W. 568, is in point."

The legal reserve policies which the above named company now desires to issue in Texas have recently been specifically authorized by the Act of the Legislature of the State of Oklahoma, (House Bill No. 394, an Act amending Section 10,624, Oklahoma Statutes, 1931, which is Section 5, Chapter 32, Session laws of 1925, relating to mutual benefit associations and authorizing such associations to reorganize as stock or mutual legal reserve life insurance companies) the company's home state.

Under the original Act, the company or association in question, was authorized to carry on the business of life or casualty insurance on the assessment or natural premium plan; however, under the amendment as above mentioned, such company or association is authorized to issue policies on a level premium plan in addition to policies on the assessment or natural premium plan.

As heretofore pointed out, Article 4781, supra, authorizes the Board of Insurance Commissioners to issue a license to a foreign company or association; only when such company or association is carrying on the business of life or casualty insurance on the assessment or natural premium plan.  Such article, however, would not prohibit a foreign company or association from obtaining a license in this State merely because such company or association might have certain additional rights within its home state.  Therefore, it naturally follows that the Board of Insurance Commissioners has the power and authority to issue a license to the above named company to do business in this State, provided that such license is limited to the business of writing life or casualty insurance upon the assessment or natural premium plan.

From the foregoing answer to your first question, it naturally follows that your second question is answered in the negative.

Trusting that the foregoing fully answers your inquiry, we remain

Very truly yours,

ATTORNEY GENERAL OF TEXAS

By  /s/ Ardell Williams

Ardell Williams
Assistant

AW:AW

APPROVED APR 19, 1940

Gerald C. Mann

Attorney General of Texas

APPROVED
OPINION COMMITTEE
BY:  B.W.B., Chairman